WILSON *v.* THE STATE OF OHIO.

*Explosives—Act regulating manufacture, storage, etc., liberally construed to effect manifest purpose—Section 5903-1 et seq., General Code (108 O. L., pt. 1, 334)—Section penalizing unlawful possession controls over general provisions of act—Section 5903-19, General Code—Strict construction of criminal statute should not defeat purposes of enactment—Blasting caps are explosives and possession thereof constitutes felony, when—Criminal law.*

1. The act of the General Assembly (108 Ohio Laws, pt. 1, 334) relating to the manufacture, keeping, storage, transportation, and sale of explosives should be reasonably construed to accomplish the manifest purpose of the enactment.

2. Section 19 of the act (108 Ohio Laws, pt. 1, 345), carrying the heading "Unlawful Possession or Use of Explosives a Felony," defining the offenses relating thereto, and prescribing penalty for a violation thereof, will control in cases falling within said section 19 over general provisions of the act.

3. While a criminal statute should be construed strictly, yet such rule of construction should not be carried to the extent of defeating the clear and manifest purpose of the enactment.

4. Blasting caps, constructed of copper jackets filled with a combination of fulminate of mercury and potassium chlorate, a highly explosive compound, are explosives within the terms and definitions of the act, and possession thereof in violation of Section 19 of the act constitutes

a felony and subjects the party guilty of the offense to the penalty provided for in said section.

(Decided March 12, 1927.)

ERROR: Court of Appeals for Montgomery county.

*Messrs. Egan & Delscamp,* for plaintiff in error.
*Mr. Ralph E. Hoskot,* prosecuting attorney, *Mr. Charles J. Brennan,* and *Mr. Albert H. Scharrer,* for defendant in error.

ALLREAD, J.  The plaintiff in error was indicted and convicted under Section 5903-19, General Code, which is Section 19 of "An act relating to the manufacture, keeping, storage, transportation, and sale of explosives, and providing penalties for any violation of this act." 108 Ohio Laws, pt. 1, 345. This section, under which the indictment and conviction was had, reads:

"Section 19.  Any person who shall have in his possession or control any cartridge, shell, bomb or similar device, charged or filled with one or more explosives, intending to use the same or cause the same to be used for an unlawful purpose, or attempts to use it to the injury of persons or property, or places or deposits it upon or about the premises of another without his consent, shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment in a state prison for a term of not less than one year nor more than twenty years.  The possession or control by any person of any such device so charged or filled, shall be deemed *prima facie* evidence of an intent to

use the same, or cause the same to be used, for
an unlawful purpose.''

The second count of the indictment, upon which
the conviction rests, charges that Wilson ''unlaw-
fully did have in his possession and in his control
a certain quantity of explosive devices, to wit, 23
detonating nitroexplosive blasting caps, the said
explosive devices, as aforesaid, being then and
there charged or filled with a certain nitroexplosive
compound, to wit, mercury fulminate and potassium
chlorate, which said certain devices, so charged or
filled with said certain nitroexplosive compound, to
wit, mercury fulminate and potassium chlorate, as
aforesaid, he, the said Jim Wilson,   *   *   *   had
then and there in his possession and control, with
the intent to use the same or cause the same to be
used for an unlawful purpose.''

Section 1 of the act referred to (Section 5903-1,
General Code) defines the important words and
phrases of the act, and is as follows:

''Section 1. The term 'explosive' or 'explosives'
whenever used in this act shall be held to mean
and include any chemical compound or mechanical
mixture that is intended for the purpose of pro-
ducing an explosion, that contains any oxidizing
and combustible units, or other ingredients, in such
proportions, quantities or packing that an ignition
by fire, friction, by concussion, by percussion, or
by detonator of any part of the compound or mix-
ture may cause such a sudden generation of highly
heated gases that the resultant gaseous pressures
are capable of producing destructive effects on
contiguous objects, or of destroying life or limb.

''For the purpose of this act manufactured

articles shall not be held to be explosives when the individual units contain explosives in such limited quantities, of such nature, or in such packing, that it is impossible to procure a simultaneous or a destructive explosion of such units, to the injury of life, limb or property by fire, by friction, by concussion, or percussion, or by detonator, such as fixed ammunition for small arms, firecrackers, safety fuse matches, et cetera.''

At this point a brief reference may be had to a narrative of the facts upon which the prosecution is based. On December 7, 1926, Theodore Lindsey, as agent for his mother, had occasion to visit a vacant residence property in the city of Dayton. Noticing that the rear steps leading to the porch had been displaced, he investigated and found hidden under the steps a brief case or bag. This was taken to police headquarters and found to contain the following articles: A sledge hammer, brace, drills, pliers, 23 blasting caps wrapped in cloth, 5 blasting caps with wire attached, wrapped in cloth, 2 loaded revolvers, a coil of fuse, and a bottle filled with a yellowish liquid in a wooden container, which was also wrapped in cloth. The liquid, under order of the police authorities, was emptied into the river. The revolvers were retained at police headquarters. The other articles were placed in the bag, which was replaced in its original position under the steps at the Lindsey house. Police were stationed in a nearby garage to watch the premises. Some time after dark the police noticed some one in the rear part of the Lindsey lot in the act of removing the steps. The police closed in, captured, and arrested the plain-

tiff in error. The brief bag had been removed from its position under the steps and was evidently dropped a short distance from its original position. Unfortunately, no analysis or examination was made of the liquid poured into the river. This prompted the trial court to take from the jury the first count of the indictment relating to possession of an explosive, and the state was compelled to rely principally upon the second count of the indictment, which related to the blasting caps. It is contended that these blasting caps were not explosives, within the meaning of Section 19 of the act above quoted. Expert evidence was offered both by the state and the defense, tending to prove the nature of the blasting caps. Mr. O. F. Hutchison, an employe of the Du Pont Powder Company of New Jersey, where the caps are manufactured, testified in detail. The primary purpose of these caps, as ordinarily used, is by a small explosion in the cap to set off a larger explosion of dynamite or nitroglycerine. Coming, however, to the real character of the blasting caps, we learn from the testimony of Hutchison that within the copper jacket of the blasting caps there is a combination of fulminate of mercury and potassium chlorate which forms a high explosive compound. The high explosive is in limited quantities and evidently designed to minimize the danger in the practical or necessary use of these caps for the purposes for which they are manufactured. Nevertheless Mr. Hutchison says:

"Q. Mr. Egan just made the remark, Mr. Hutchison, that you would not be afraid to put such a piece of fuse into one of these blasting caps and set

it off in a cigar box in this room; would you care to do that?

"A. No, sir; I would not.

"Q. Why not?

"A. I would be afraid of flying pieces of copper; it would be very dangerous.

"Q. You have said that the combination of ingredients in these blasting caps is a high explosive, have you not?

"A. Yes, sir.

"Q. Do you know of any illegal or unlawful use or purpose that this cap could be used for, in itself?

"A. Why, yes; I think it could be.

"Q. Well, what would you say?

"A. I think it could be put in the way of some person who did not know what it was, and if it was connected to a fuse or hit in some way it might cause severe injury to a person who was in close proximity to it.

"Q. Would there be any danger if I would throw that on the floor like that—would it be apt to explode?

"A. Well, in my opinion it would be dangerous; yes."

Mr. Henry C. Stoltz, a farmer who had handled explosives, testifies, in part, as follows:

"Q. Do you consider those dangerous—as a matter of fact, lying in your residence that way, Mr. Stoltz, with you and your family about there?

"A. Well, they are in this container, and I am required to have it on wheels.

"Q. The container?

"A. Yes, sir; so it can be hastily taken from the house.   *   *   *

"Q. I will ask you whether or not it contains a high explosive?

"A. Yes, sir.

"Q. Do you know whether or not it is fulminate of mercury and potassium chlorate?

"A. I only know it is a high explosive.

"Q. Would you hit this electric blasting cap with a hammer—a blasting cap being held on a stone or iron?

"A. No.

"Q. Why not?

"A. Dangerous."

This, in general, is the expert testimony as to the character of blasting caps. Coming back to Section 19 (Section 5903-19, General Code), which describes the offense, the statute refers to the container as "any cartridge, shell, bomb or similar device." The blasting cap is claimed by the state to come under the head of "similar device." It is not in a strict sense either a cartridge, shell, or bomb, but is similar in principle. There is an outside shell or container with an interior explosive. The blasting cap for all practical purposes is a similar device. Its use is different, but the general construction and general purpose is similar, and the important feature is that the outside container is charged or filled with a high explosive. The only element of safety in their legitimate use is the limited quantities of the high explosive, but the witnesses testify that in the explosion of the blasting caps even separately the shell collapses and fragments thereof are thrown in such a way as to cause injury to property and to human beings. It also appears that even in the legitimate

use of blasting caps, great care must be observed to protect property and persons from accidental injuries.

If we turn to the definition section (Section 5903-1, General Code), we find that:

The term "explosive" includes "any chemical compound or mechanical mixture that is intended for the purpose of producing an explosion, that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities or packing that an ignition by fire, friction, by concussion, by percussion, or by detonator of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects, or of destroying life or limb."

This is a broad definition and was evidently intended to protect not only against the usual and ordinary use of explosives, but against accidental or fortuitous causes, as well as against illegal use. It is contended, however, that blasting caps are especially mentioned in the magazine section of the act (Section 5903-8, General Code), and are exempt from the regulations when kept in quantities of less than 1000, and that they are not provided for in the license section of the act (Section 5903-11, General Code). Still, as we read the entire act, blasting caps were not intended to be exempted from the general provision of the act, especially if, as a matter of fact, they are explosives within the meaning of Section 1 and Section 19 of the act, and are a similar device to cartridges, shells, and bombs, as described in Section 19.

It is claimed that the mere lifting of the bag or brief case by Wilson, and possession for an instant, does not make out a case for an application of the *prima facie* evidence clause of the statute.

This condition must be viewed in the light of the entire case as developed by the state's evidence. Evidently some one had placed the bag and contents under the steps of the Lindsey home, and it is a reasonable inference from all the circumstances that Wilson, or some one in conspiracy with him. originally placed the bag containing the explosives there, and that Wilson's appearance to reclaim the bag and contents was connected with the original hiding of the bag. The state was therefore entitled to the natural inference from all the circumstances. It would be unfair to the state to disconnect Wilson's lifting the bag from under the steps from the other circumstances showing the original placing of the bag in that position. The state was entitled to have the entire case go to the jury not only for the purpose of connecting Wilson with the temporary lifting of the bag from under the steps, but also with the original deposit of the bag, and was entitled to the inferences that would naturally arise from all the circumstances.

The questions of fact were, in our judgment, properly submitted to the jury.

Certain requests to charge were made before argument. It was discretionary with the trial court whether he would give the charges before argument, under the decision in the case of *Wertenberger* v. *State*, 99 Ohio St., 353, 124 N. E., 243, but having given them they may be considered in connection with the general charge. The special request in

respect to the presumption of innocence asked by counsel for plaintiff in error was, in our judgment, properly rejected, especially when coupled with the offer of the trial court to give a correct charge on that subject. The charge so offered by the trial court was given in the general charge. There was therefore no error in this respect. The state requested special charge No. 1 before argument, relating to the second count of the indictment, and this charge was given. It is claimed by counsel for plaintiff in error that that charge was incomplete. We are of opinion, however, that the charge taken in connection with the general charge on the same subject was complete, and that the plaintiff in error was not prejudiced.

Counsel for plaintiff in error also urge that the trial court erred in entering the sentence upon the verdict without waiting for a motion for a new trial. We think this was discretionary with the trial court, and, in view of the fact shown by the record that a motion for a new trial was filed and duly heard thereafter, there could be no prejudice from the mere fact that the sentence was pronounced in advance of the motion for a new trial.

This brings us to the sentence. Section 19 of the act under consideration (Section 5903-19, General Code) makes the particular offense charged therein a felony and prescribes within the section itself the punishment for the violation thereof.

Section 23 of the act (Section 5903-23, General Code) provides:

"Whoever fails to comply with or violates any of the provisions of this act shall be guilty of a

misdemeanor, and upon conviction shall be punished by a fine of not less than twenty-five ($25.00) dollars nor more than five hundred ($500.00) dollars.''

It is contended that this provision as to penalty is in conflict with the special penalty provided for the violation of Section 19 (Section 5903-19, General Code), and it is contended that, this being a criminal statute, it must be construed favorably to the accused. We concede the general proposition. Nevertheless, the act must be construed reasonably and not with undue technicality. This rule is thus stated in the syllabus of *Conrad* v. *State,* 75 Ohio St., 52, 78 N. E., 957, 6 L. R. A. (N. S.), 1154, 8 Ann. Cas., 966:

''The rule as to strict construction of penal statutes does not require the courts to go to the extent of defeating the purpose of the statute by a severely technical application of the rule.''

The *Conrad case* cites with approval the case of *United States* v. *Hartwell,* 6 Wall., (73 U. S.), 385, 18 L. Ed., 830, in which the rule is thus stated:

''The admitted rule that penal statutes are to be strictly construed is not violated by allowing these words to have full meaning, or even the more extended of two meanings, where such construction best harmonizes with the context, and most fully promotes the policy and objects of the Legislature.''

In the case of *Warren People's Market Co.* v. *Corbett & Sons,* 114 Ohio St., 126, 151 N. E., 51, the following is quoted from the syllabus:

''In construing a statute which imposes specific penalties for its violation, the court must examine the entire act to determine whether or not it was

the purpose of the legislature, in addition to imposing express penalties for the violation of the law, to render void any contract based on the prohibited act.''

So we think it is clear that in the present act the Legislature intended to make Section 19 an important feature in a criminal sense. The other sections of the act applied generally to legitimate use of explosives and were in a general sense mere regulatory provisions. Section 19, however, was intended to apply to persons using high explosives for an illegitimate or unlawful purpose. Consequently, in the very headlining of the act it was declared that the unlawful possession or use of explosives was a felony, and within the section itself a penalty was expressly provided. There is nothing in the act which shows an intention to withdraw or change the penalty expressly provided in Section 19, except the general language of Section 23. This general language, in our judgment, must give way to the express language of Section 19. Any other construction would be unreasonable and would thwart one of the main purposes of the act, if not the principal one. No one can read the act under consideration without being impressed with the fact that Section 19 and the penalty therein provided were intended as an exception to the general provisions of Section 23. In that way, and in that way only, can the entire act be reconciled. We are therefore of opinion that the trial court was justified under the statute in imposing the sentence provided for in Section 19 of the act.

Finding no error in the record prejudicial to the plaintiff in error, the judgment of the court of

common pleas must be affirmed. Suspension of sentence heretofore allowed is hereby terminated.

*Judgment affirmed; suspension of sentence terminated.*

Ferneding and Kunkle, JJ., concur.