**John D. PAULSON, Clarence D. Johnson, R. R. Smith, and Carl Albers, Plaintiffs,**

v.

**Ben MEIER, Secretary of State for the State of North Dakota, Defendant.**

**Civ. No. 618.**

United States District Court
D. North Dakota,
Southwestern Division.

Aug. 10, 1965.

E. T. Conmy, Sr., of Conmy, Conmy & Feste, Fargo, N. D., for plaintiffs.

Paul M. Sand, First Asst. Atty. Gen., Bismarck, N. D., for defendant.

William R. Reichert, Dickinson, N. D., and Herbert L. Meschke, of Pringle, Herigstad, Meschke, Loder, Mahoney & Purdy, Minot, N. D., amicus curiae.

Before VOGEL, Circuit Judge, and REGISTER and DAVIES, District Judges.

REGISTER, District Judge.

Our previous opinion issued in this case in July, 1964, and reported at 232 F.Supp. 183, states the nature of the case, the issues involved, and the factual background necessary for an understanding thereof.

During the month of June, 1964, the controlling principles and general guidelines to be applied in determining the issues heretofore raised had been announced by the Supreme Court of the United States in Reynolds, etc. et al. v. Sims et al., 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed. 2d 506, and related cases.[1] After carefully considering the then existing apportionment law of this state in the light of the teachings of the Supreme Court in the cases cited, we said: "It is our conclusion, and we so hold, that there is no constitutionally valid legislative apportionment law in existence in the State of North Dakota at this time." (232 F. Supp., at page 187) In considering the appropriate remedy to be granted, we referred to several of the Supreme Court cases heretofore cited, and to specific portions thereof. These included:

"* * * And it (the United States District Court for the Middle District of Alabama) correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Reynolds, supra, 377 U.S. at page 586, 84 S.Ct. at page 1394;

and, in the Maryland Committee, supra, 377 U.S. at page 676, 84 S.Ct. at page 1440:

"Since primary responsibility for legislative apportionment rests with the legislature itself and since adequate time exists in which the Maryland General Assembly can act, the Maryland courts need feel obliged to take further affirmative action only if the legislature fails to enact a constitutionally valid state legislative apportionment scheme in a timely fashion after being afforded a further opportunity by the courts to do so."

After discussing and analyzing the election laws of this state, the then proximity and imminence of the general election, the fact that the election machinery

1. WMCA, Inc. et al. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; Lucas et al. v. Forty-Fourth General Assembly, etc. et al., 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632; Maryland Committee for Fair Representation et al. v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis, Secretary, et al. v. Mann et al., 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609, and Roman, etc. et al. v. Sincock et al., 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620.

was then in progress, the mechanics and complexities of the election laws, the disruptive effect upon the election process which would necessarily result from attempting to grant immediate relief, and after considering the applicable quoted admonitions of the Supreme Court, a majority of this Court, applying equitable principles, concluded:

"We hold that the Thirty-ninth Legislative Assembly (1965) of North Dakota, consisting of members elected under existing law, will have a de facto status; that at such regular session it should promptly devise and pass legislation creating and establishing a system of legislative districting and apportionment consistent with federal constitutional standards; that the effective date of this Order and Decree will be stayed until after the 1964 general elections have been held and for a reasonable time after the commencement of the 1965 Legislative Assembly in order to afford such Assembly a reasonable and adequate opportunity to enact such apportionment legislation. * * We retain and reserve jurisdiction herein for such further relief and orders, if any, as may hereafter be deemed proper." (232 F. Supp., at page 190)

█ Now pending before us is Defendant's Motion for Dismissal and Clarification. The asserted basis upon which Defendant contends he is entitled to a dismissal of the action is that the Thirty-ninth Legislative Assembly did enact a new apportionment act, House Bill No. 566, which he contends is a " * * * valid act and substantially meets the requirements set forth by the United States Supreme Court". A certified copy of the act is attached to the Motion as an exhibit; this exhibit discloses that it was duly passed by the Legislative Assembly (which convened on January 5, 1965, and adjourned on March 5, 1965), was filed in the office of the Defendant on March 20, 1965, and, being neither vetoed nor approved by the Governor of this state, became law on July 1, 1965. (Sections 67 and 79, Constitution of North Dakota.) In their Return to said Motion, insofar as this aspect of the case is concerned, Plaintiffs object to such a dismissal upon the ground that said House Bill 566 " * * * provides for a system of legislative districting and apportionment which is discriminatory and not consistent with federal constitutional standards", and, accordingly, Plaintiffs ask that this Court, " * * * if it finds House Bill No. 566 to be unconstitutional or illegal, by decree create and devise a system of legislative districting and apportionment consistent with federal constitutional standards". Defendant asserts, in view of Plaintiffs' prayer for relief, that said Plaintiffs are, in effect, asking this Court to determine the constitutionality of House Bill 566, and urges that this question is not presently before the Court. Our previous order and directive was that the Legislative Assembly " * * * promptly devise and pass legislation creating and establishing a system of legislative districting and apportionment *consistent with federal constitutional standards*". (Emphasis supplied.) We are of the opinion that the first and basic question to be determined by us is whether House Bill 566 is "consistent with federal constitutional standards", that this question is here present, and that whether the action taken by the legislature is valid or a nullity depends upon our determination of that question. We therefore direct our attention to the question of whether House Bill 566 is a valid reapportionment law.

Prior to oral argument on the pending motion, we granted the petition of State Senator William R. Reichert for leave to appear *amicus curiae*, and also the motion to appear, *amicus curiae*, of thirteen residents and qualified voters of this state who are designated, collectively, as the "Committee for Fair Reapportionment". We have had the benefit and assistance of briefs and oral argument of both Mr. Reichert and of Mr. Herbert L. Meschke, counsel for said Committee. Mr. Reichert was a member of the Senate from Stark County during the 1965 Legislative Assembly and had been a member of the Legislative Research Committee, which

will be hereinafter referred to. Mr. Meschke was a member of the House of Representatives, from Ward County, at said Legislative Assembly. We express our gratitude and appreciation to these gentlemen, who appeared as "friends of the court", for the information and assistance given us.

██ The test as to whether an apportionment act meets the federal constitutional standards has been stated by the Supreme Court in Reynolds, supra, as follows:

> "We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." (377 U. S., at page 568, 84 S.Ct., at page 1385.)

In Reynolds, the Court referred to Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, as having " * * * established the basic principle of equality among voters within a State, * * *" and that " * * * voters cannot be classified, constitutionally, on the basis of where they live, at least with respect to voting in statewide elections." ; and to Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, as finding that " * * 'our Constitution's plain objective' was that 'of making equal representation for equal numbers of people the fundamental goal' ", and "To say that a vote is worth more in one district than in another would * * * run counter to our fundamental ideas of democratic government * * *".

By way of explaining its expression of the standard to be applied, the Court in Reynolds, supra, 377 U.S. at page 577, 84 S.Ct. at page 1390 said:

> "By holding that as a federal constitutional requisite both houses of a

state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."

The Court therein emphasized the fact that some flexibility may be constitutionally permissible; that "What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case" ; that "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme"; and that "Valid considerations may underlie such aims". However, the Court continued: "Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State". (377 U.S., pp. 578, 579, 84 S.Ct., p. 1390)

According to the federal census of 1960, the population of the State of North Dakota, in that year, was 632,446. On the basis of a Senate consisting of 53 senators and a House of Representatives consisting of 106 members (as provided in House Bill 566), this results in a ratio of one senator and two representatives for 11,933 persons. As provided by House Bill 566, the actual population per senator varies from 10,255 persons in District 9 to 14,253 persons in District 36. District 9, therefore, is more than 14% under the statewide average, while District 36 is 19.4% above that average. If the mathematical weight of one person in District 36 is 1, the voting weight of one person in Dis-

trict 9 is 1.39. A very similar variance exists as between the voting weight of persons in District 5 (having a population per senator of 10,331) and District 36; the disparity in the voting weight of one person in several other Districts and one person in District 36 exceeds 1.3. Realizing that disparities existing between the extremes, and also as between a relatively few Districts, are not necessarily controlling and that the plan should be considered in its totality, we have considered the situation which exists under this law (House Bill 566) in areas embracing several Districts, taken as a whole.

That portion of North Dakota lying south and west of the Missouri River comprises approximately one-fourth of the total area of the state. The total population of six of the seven Districts (District 21 being omitted) comprising that area is 81,931, an average per senator of 13,655 persons. This figure is approximately 14.5% above the statewide average. For purposes of reference, we refer to this area as "Area A", which is a compact, contiguous area overwhelmingly rural in character. The total population of Districts 9 (part of Ward County) and 15 (part of Grand Forks County) is 83,899, only 1,968 more than the total population of "Area A". However, "Area A" is, under House Bill 566, entitled to only six senators and twelve representatives, while each of Districts 9 and 15 is entitled to four senators and eight representatives—a total of two senators and four representatives more than "Area A". We refer to Districts 9 and 15 as "Area B". The disparity in voting strength of persons in Areas A and B exceeds a ratio of 1.3 to 1. In considering other rather widely scattered Districts in which the total population approximates that of "Area A", we find that the combined population of Districts 3, 5, 7, 8, 10 and 12 (which we refer to as "Area C") is 75,677. This Area is to be represented by seven senators and fourteen representatives. Thus, "Area C", with a population total of 6,254 less than "Area A", is, under House Bill 566, represented by one more senator and two more representatives. In summary, we have the following:

| | Population | Senators | Rep. | Population per Senator |
|---|---|---|---|---|
| "Area A" | 81,931 | 6 | 12 | 13,655 |
| "Area B" | 83,899 | 8 | 16 | 10,487 |
| "Area C" | 75,677 | 7 | 14 | 10,811 |

Expressed differently, the voting strength of three persons residing in some districts in this State is approximately equivalent to the voting strength of four persons residing in other districts.

In Roman v. Sincock, supra, 377 U.S. at page 710, 84 S.Ct. at page 1458 the Supreme Court, in commenting upon the "constitutionally permissible bounds of discretion in deviating from apportionment according to population", said:

"In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

The Supreme Court of North Dakota, in discussing the generally recognized rule that in a situation such as that with which we are faced, the legislature is vested with " * * * a discretion to make an apportionment that varies to some extent from absolute equality of representation", said:

" * * * they (referring to several cited cases) serve to demonstrate that there is inherent in a constitutional direction to a legislature to apportion representatives among senatorial districts according to population a limited discretion to make the apportionment that will approach, as nearly as is reasonably possible, a mathematical equality." State ex rel. Lein et al. v. Sathre et al., 113 N.W.2d 679, 685.

The United States District Court for the Northern District of Georgia, in discussing the validity of the apportionment plan of the Georgia General Assembly, stated that:

"The controlling principle is one man-one vote which means that the ratio and theoretical minimum would coincide, but as was noted in Reynolds v. Sims, '[m]athematical exactness or precision is hardly a workable constitutional requirement,' and some variances will be permitted to allow voice to political subdivisions. However, the rule of equality in the population of districts as near as practicable means just that and each district should be composed 'as near as practicable' of the average population." Toombs et al. v. Fortson et al., 241 F.Supp. 65, 69.

From the foregoing analysis of House Bill 566 it clearly appears that the cumulative effect of all the disparities from population-based representation is that persons comprising more than one-eighth of the population of this State, and who reside in the same general compact, contiguous area, have had the weight of their votes " * * * in a substantial fashion diluted when compared with votes of citizens living in other parts of the State" (Reynolds, supra, 377 U.S. p. 568, 84 S.Ct. p. 1385) and their right to vote has thereby been unconstitutionally impaired.

Defendant strenuously contends that House Bill 566 was the best and only plan that could have been adopted by the Thirty-ninth Legislative Assembly and was the product of "an honest and good faith effort" on the part of its members. The evidence before us establishes that at said session eight apportionment plans were introduced and considered, one of which was House Bill 566 and another which will be hereafter referred to in detail. With reference to whether a good faith effort to establish districts in compliance with constitutional requirements has been made we read, in Lucas, supra, 377 U.S. at page 735, n. 27, 84 S.Ct. at page 1473:

"Consistent with this approach, in determining whether a good faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole. Only after an evaluation of an apportionment plan in its totality can a court determine whether there has been sufficient compliance with the requisites of the Equal Protection Clause. Deviations from a strict population basis, so long as rationally justifiable, may be utilized to balance a slight overrepresentation of a particular area in one house with a minor underrepresentation of that area in the other house. But, on the other hand, disparities from population-based representation, though minor, may be cumulative instead of offsetting where the same areas are disadvantaged in both houses of a state legislature, and may therefore render the apportionment scheme at least constitutionally suspect."

The practical problems and difficulties encountered by the members of the Legislative Assembly in attempting to pass an equitable and constitutionally valid apportionment law, and the history of House Bill 566, was presented in some

detail by Mr. Reichert. In his brief he referred to various actions of the Senate and the House, and disagreements of conference committees, and stated: "Finally, in desperation, on the final day of the session both houses faced with the prospect (of) no reapportionment at all appointed a new conference committee composed of the majority and minority leaders of each house and the two chairmen of the State and Federal Committees", and that, in accordance with the agreement of the committee, House Bill 566 was rewritten and passed. This history was likewise presented in oral argument and stands undisputed. It is thus apparent that House Bill 566, as passed, was the result of compromise, arrived at by proponents of various divergent plans at the eleventh hour. Of course a wide divergence of opinion as to legislation of this character could reasonably be expected, and need of willingness to compromise would be unavoidable. We have no doubt that many legislators—both senators and members of the House of Representatives—diligently and conscientiously attempted to perform their duty in accordance with both the letter and the spirit of the law. However, the plan itself clearly reveals that factors other than that of fair and equitable representation on the basis of population were considered; that the substantial disparities are not the result of an effort to "adhere to a policy of keeping legislative districts within existing county lines", or to "maintain the integrity of various political subdivisions * * *" (House Bill 566 violates 16 county lines and numerous boundary lines of smaller subdivisions); that the plan reveals no "apparent rational design" upon which justification for such disparities could conceivably be based; that said plan fails to disclose, as its basis, any "sound state policy" that would merit the further and special consideration of the Court; and that there are no "unusual circumstances" which can give validity to the act.

Because of Defendant's contention that House Bill 566 is the result of "an honest and good faith effort" on the part of the Legislative Assembly, we have, notwithstanding the existence of substantial disparities in the weight of voting strength of individuals resulting from their respective places of residence, as previously noted, carefully examined the districting provided in said plan from the standpoint of the maintenance of "the integrity of various political subdivisions", and "apparent rational design", or generally existent "unusual circumstances" which may bear upon the question of validity of such legislation. It is clear that none of these factors was substantially involved. In order not to unduly lengthen this opinion, only District 36 will be specifically referred to for illustrative purposes. Within the boundaries of this District are approximately (in area) the eastern five-ninths of Stark County, approximately the western four-fifths of Morton County, and all of Oliver County. Stark County and Oliver County have no common boundary. The north line of Stark County, at its northeast corner, runs directly east and west; this line, if extended east from said corner, constitutes approximately 16 miles of the south boundary of Mercer County, at which point it becomes the southwest corner of Oliver County and continues to the east in a straight line as the south boundary of Oliver County to the Missouri River (the east boundary of Oliver County). In other words, the southwest corner of Oliver County is approximately 16 miles due east of the northeast corner of Stark County. The western boundary of this District is within a very few miles east of the City of Dickinson; the eastern boundary, at its most distant point, lies nearly 90 miles to the east. The main east-west highway in this area is Interstate 94 which runs, with slight variations, east and west between Mandan and Dickinson; for persons residing in Oliver County (the southern boundary of which is several miles north of said highway) to travel to Dickinson, the ordinary route would be to proceed south to Interstate 94 on State Highway 25 (which intersects Interstate 94 about 6 miles west of Mandan), or State Highway 31 (which intersects said highway about 30 miles west of Mandan and 70 miles east of

Dickinson). In order to effect contiguity between Oliver County and that portion of Stark County embraced within District 36, the Legislative Assembly included a portion of Morton County, the north boundary of which has, for approximately 30 miles, a common boundary with the south line of Oliver County. We are not persuaded that such a District was formed to "maintain the integrity of various political subdivisions", or that it was formed with any basic "apparent rational design", or that it was devised because of a community of interest of the residents thereof (such as transportation conveniences or facilities, or trade centers, or other "unusual circumstances"). To say that District 36 lacks compactness is a gross understatement.

We do not underestimate the practical difficulties which must be dealt with by a malapportioned legislature in obtaining the enactment of an apportionment law which satisfies the constitutional requisites. A three-judge District Court in Montana, recently faced with a situation such as that here presented, remarked: (Herweg et al. v. Thirty-ninth Legislative Assembly of State of Montana et al., 1965, U.S.D.C., Mont., Helena Division)

> "We appreciate that the task of the Legislative Assembly in this respect is for many of its members most distasteful. Experience in other States has indicated that even after court decisions have been handed down the Legislators have undertaken to evade their duties either by doing nothing or by attempting to enact impermissible or insufficient legislative provisions."

We are satisfied that House Bill 566 does not meet the test of being the result of "a good faith effort to establish districts substantially equal in population", and we are convinced, and so hold, that said Bill does not comply with the constitutional requisites of the Equal Protection Clause of the Federal Constitution, and is therefore a nullity. Accordingly, Defendant's motion to dismiss is denied.

We are thus confronted with the question of the remedy to be fashioned, and the effective date of that remedy.

Defendant urges that " * * * in any event the 1965 apportionment act, House Bill No. 566, should be deemed valid or at least permitted to stand as an interim apportionment act with directions for refinement". Plaintiffs ask that we "by decree create and devise a system of legislative districting and apportionment consistent with federal constitutional standards".

In our previous decision (Paulson et al. v. Meier et al., 232 F.Supp. 183) we quoted that portion of the opinion of the Supreme Court in The Maryland Committee, supra, which is also herein quoted and which, we believe, clearly dictates our present obligation and duty. Also, in our previous decision, because of what we believed to be in accord with equitable principles, for the best interests of the State, and consonant with the teachings of the Supreme Court, we withheld further affirmative action for one reason, therein clearly expressed, viz.: "in order to afford such Assembly a reasonable and adequate opportunity to enact such apportionment legislation". We therein stated that the duty of the Legislative Assembly was to "promptly devise and pass legislation creating and establishing a system of legislative districting and apportionment consistent with federal constitutional standards". The Supreme Court of North Dakota had previously, in State ex rel. Lein v. Sathre, supra, held specifically: "We are of the opinion that the duty of the Legislature to apportion is mandatory and continues until it is performed". The duty of the Thirty-ninth Legislative Assembly, with reference to this particular legislation, had been unequivocally expressed, therefore, by both the Supreme Court of North Dakota and this Court. We assumed, and were confident, that the members of that Legislative Assembly would discharge their clearly defined duty, difficult and distasteful though it might be, and that said legislature would exercise the function which properly and primarily belonged to it, in accord with judicial mandates, and hence we gave it a reasonable and adequate opportunity to provide its own remedy by

**44**

the performance of its mandatory duty. Now, however, as that Assembly has had a fair and reasonable opportunity to take the necessary affirmative action, and failed to do so, we conceive it to be our duty (likewise distasteful to the Court), under the clearly expressed directive of the Supreme Court in The Maryland Committee, heretofore quoted, to take further affirmative action by way of formulating and devising an apportionment scheme which is constitutionally valid.

 We have carefully and meticulously examined and considered each of the plans introduced at the Thirty-ninth Legislative Assembly. We turn our attention to one of those plans, designated at that session as the "Smith" plan. In Paulson, supra, we said:

"We note that for several months prior to June 15 the Legislative Research Committee of this State had publicly announced it was considering legislative apportionment legislation which would affect both houses of the North Dakota Legislative Assembly and which would comply with constitutional requirements."

For several months prior to the commencement of the next session of that Assembly (the Thirty-ninth), the Legislative Research Committee had been considering such proposed legislation. That Committee had engaged Mr. R. R. Smith, a qualified and experienced Certified Public Accountant and resident of this state, to prepare and submit a plan of legislative apportionment based as precisely as practicable upon population as revealed by the 1960 federal census, but bearing in mind certain appropriate guiding principles with emphasis upon maintaining the integrity of county boundaries, where possible. Such a plan was prepared and submitted to a subcommitte of the LRC; said subcommittee unanimously approved it. Public hearings were thereafter held in different cities of the state. The LRC was composed of nineteen members; nine were experienced and influential members of the legislature, ten were prominent citizens of the state who, by reason of their places of residence, fairly repre-

sented the various sections of the state. Each of the major political parties was represented. The plan, as approved by the subcommittee, was thereafter unanimously approved by the LRC and submitted to the Legislative Assembly for action, under the designation Senate Bill 39. Senate Bill 39 was adopted by the Senate but rejected by the House of Representatives.

We have exhaustively considered the plan as set forth in Senate Bill 39. We find it not perfect. Five "multi-member" districts are created; county lines are violated in twelve instances. However, it is clear that in its totality, it results in "substantial equality of population among the various Districts", that it is a product of "faithful adherence to a plan of population-based representation", and that it is free "from any taint of arbitrariness or discrimination". It is readily apparent that the integrity of all county lines cannot be maintained if the one man-one vote principle is substantially adhered to. Insofar as the multi-member districts are concerned, if experience proves that practical difficulties or inequities result therefrom, appropriate remedial legislation may reasonably be expected.

The "mathematical exactness" of this "Smith" plan is impressive. The variation from the state-wide average in five of the thirty-nine districts is less than 1%. In twenty-five of the thirty-nine districts the variation is within 5% of the average figure, and in four districts it is slightly over 5%. In only two of the thirty-nine districts does such variation exceed 9%. District 2 is 15.83% above the average; District 32 is 12.15% below the average. By slightly modifying the plan (transferring from District 2 to District 1 the area consisting of five townships immediately west of and adjacent to District 1, bounded on the south by the Missouri River, on the west by the Montana line, and on the north by an extension of the north boundary line of District 1 in a straight line to the Montana line, such area embracing the townships of Judson, Trenton, Buford, Hard-

scrabble and Round Prairie), the population of District 1 varies from the state-wide average by only 3.84% and the variation from that basic figure of District 2 would be 10.13%. We recognize that the population as disclosed by the federal census of 1960 is controlling in this matter, but judicially note that the population of the City of Bismarck, comprising a part of District 32, is now, and has been since 1960, rapidly increasing. In its printed report (a part of the record on file herein) the LRC made note of this fact and also that, in order to bring the existing variation closer to the basic figure in that District, from two to four county boundaries would be traversed, whereas in the proposed plan they are kept intact. Also, as a part of the record on file herein, is a Census Bureau report showing that the population of Bismarck has increased, from 1960 to 1963, by 2,824 persons. Hence, at this latter time, the actual variation from the state-wide average in District 32 would in fact be less than 3% above the basic figure.

The so-called "Smith" plan, as modified by the described change affecting Districts 1 and 2, is hereinafter set forth as Appendix I, and made a part hereof; the same is hereby adopted and declared to be the legislative apportionment law of the State of North Dakota, to become effective upon the filing hereof, and to continue in full force and effect until the same is duly amended or reenacted in accordance with law. Attached hereto as Appendix II (also made a part hereof) is a section of a map of the State of North Dakota, prepared by the Legislative Research Committee, indicating the boundaries of each of the thirty-nine legislative districts and the population thereof. Upon said map clearly appears the modification of the "Smith" plan, made by this Court; District 1, as modified, appears shaded.

■ In Defendant's motion he seeks "clarification" of that portion of this Court's previous decision (Paulson, supra) which provided that the Thirty-ninth Legislative Assembly would have a "de facto status", which expression, De-fendant claims, "leaves us in doubt as to whether or not the present legislative members may continue to constitute a de-facto body or be part of a de facto body * * *". In his argument, counsel for Defendant referred to pending legislation which has been referred to popular vote and the possibility of the calling of a special session of the legislature for the purpose of considering certain legislation. He indicates that in the event of such a special session and the passage of legislation, the validity thereof may be judicially challenged. It is our opinion, insofar as this matter is concerned, there presently exists no justiciable controversy; all of the "possibilities" are prospective and anticipatory in character, and in effect Defendant seeks from us an advisory opinion.

In Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, at pages 113, 114, 68 S.Ct. 431, at page 437, 92 L.Ed. 568, the Supreme Court of the United States stated:

> "This Court early and wisely determined that it would not give advisory opinions even when asked by the Chief Executive. It has also been the firm and unvarying practice of Constitutional Courts to render no judgments not binding and conclusive on the parties * * *."

And, in McGrath, Attorney General et al. v. Kristensen, 340 U.S. 162, n. 6 at page 167, 71 S.Ct. 224, at page 228, 95 L.Ed. 173, the rule is stated thusly:

> "Federal constitutional courts act only on cases and controversies and do not give advisory opinions."

A motion very similar to that presently before us was presented to a three-judge federal district court in Jonas et al. v. Hearnes et al., May 9, 1965, U.S.D.C., W.D.Mo., Central Division, 246 F.Supp. 70, in which action the constitutionality of the Missouri apportionment of representation in both houses of the Missouri legislature was challenged. In its order of above date, that Court said:

> "Defendants' motion for amendment of this Court's memorandum or in

the alternative for instructions seeks clarification of the first above-quoted paragraph, supra p. 71, from the memorandum. It asks the Court to define the term 'de facto' as used in that paragraph and 'whether * * it will be necessary for all members of the House of Representatives and Senate to be elected,' presumably under the reapportioned districts, before the governor is authorized to call a special session of the General Assembly any time after July 15, 1965."

With reference to such request for clarification, that Court held as follows:

"Defendants' motion is denied for the reason that the Court is not authorized to give advisory opinions and defendants' motion presents no justiciable issue."

That portion of Defendant's motion which requests clarification of our previous decision seeks relief which exceeds our authority to grant, and is therefore denied.

It is so ordered.

## APPENDIX I

### SECTION 1. STATE LEGISLATIVE APPORTIONMENT.

The legislative districts of the state shall be formed, and senators and representatives shall be apportioned as follows:

1. The first legislative district shall consist of township one hundred fifty-two north, range one hundred west; townships one hundred fifty-three north of ranges one hundred and one hundred one west; townships one hundred fifty-four north of ranges one hundred and one hundred one west; township one hundred fifty-two north, ranges one hundred three and one hundred four west; townships one hundred fifty-three north, range one hundred two, one hundred three and one hundred four west; and townships one hundred fifty-four north, ranges one hundred two, one hundred three and one hundred four west, lying within the county of Williams, and shall be entitled to one senator and two representatives;

2. The second legislative district shall consist of the county of Divide and all of the county of Williams except the townships thereof which comprise the first legislative district, and shall be entitled to one senator and two representatives.

3. The third legislative district shall consist of the counties of Burke and Renville and townships one hundred fifty-seven north of ranges eighty-four, eighty-five, eighty-six, and eighty-seven west; township one hundred fifty-eight north, range eighty-seven west; townships one hundred fifty-nine north of ranges eighty-seven, eighty-eight, and eighty-nine west; townships one hundred sixty north of ranges eighty-seven, eighty-eight, and eighty-nine west; and township one hundred sixty-one north, range eighty-eight west lying within the county of Ward, and shall be entitled to one senator and two representatives;

4. The fourth legislative district shall consist of the county of Mountrail and townships one hundred fifty-one north of ranges eighty-five, eighty-six, and eighty-seven west; townships one hundred fifty-two north of ranges eighty-five, eighty-six, and eighty-seven west; townships one hundred fifty-three north of ranges eighty-five, eighty-six, and eighty-seven west; townships one hundred fifty-four north of ranges eighty-five, eighty-six, and eighty-seven west; townships one hundred fifty-five north of ranges eighty-five, eighty-six, and eighty-seven west; and townships one hundred fifty-six north of ranges eighty-five, eighty-six, and eighty-seven west

lying within the county of Ward, and shall be entitled to one senator and two representatives;

5. The fifth legislative district shall consist of townships one hundred fifty-five north of ranges eighty-one, eighty-two, eighty-three, and eighty-four west; townships one hundred fifty-six north of ranges eighty-one, eighty-two, eighty-three, and eighty-four west; and townships one hundred fifty-seven north of ranges eighty-one, eighty-two, and eighty-three west lying within the county of Ward, and shall be entitled to three senators and six representatives;

6. The sixth legislative district shall consist of the county of Bottineau and townships one hundred fifty-eight north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west; townships one hundred fifty-nine north of ranges seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west lying within the county of McHenry, and shall be entitled to one senator and two representatives;

7. The seventh legislative district shall consist of townships one hundred fifty-one north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west; townships one hundred fifty-two north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west; townships one hundred fifty-three north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west; townships one hundred fifty-four north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west; townships one hundred fifty-five north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west;

townships one hundred fifty-six north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west; and townships one hundred fifty-seven north of ranges seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine, and eighty west lying within the county of McHenry and townships one hundred fifty-one north of ranges eighty-one, eighty-two, eighty-three, and eighty-four west; townships one hundred fifty-two north of ranges eighty-one, eighty-two, eighty-three, and eighty-four west; townships one hundred fifty-three north of ranges eighty-one, eighty-two, eighty-three, and eighty-four west; and townships one hundred fifty-four north of ranges eighty-one, eighty-two, eighty-three, and eighty-four west lying within the county of Ward, and shall be entitled to one senator and two representatives;

8. The eighth legislative district shall consist of the county of McLean, and shall be entitled to one senator and two representatives;

9. The ninth legislative district shall consist of the county of Rolette and townships one hundred fifty-seven north of ranges sixty-seven and sixty-eight west; townships one hundred fifty-eight north of ranges sixty-seven and sixty-eight west; townships one hundred fifty-nine north of ranges sixty-seven and sixty-eight west; townships one hundred sixty north of ranges sixty-seven and sixty-eight west; townships one hundred sixty-one north of ranges sixty-seven and sixty-eight west; townships one hundred sixty-two north of ranges sixty-seven and sixty-eight west; townships one hundred sixty-three north of ranges sixty-seven and sixty-eight west; and townships one hundred sixty-four north of

ranges sixty-seven and sixty-eight west lying within the county of Towner, and shall be entitled to one senator and two representatives;

10. The tenth legislative district shall consist of the county of Cavalier and townships one hundred fifty-seven north of ranges sixty-five and sixty-six west; townships one hundred fifty-eight north of ranges sixty-five and sixty-six west; townships one hundred fifty-nine north of ranges sixty-five and sixty-six west; townships one hundred sixty north of ranges sixty-five and sixty-six west; townships one hundred sixty-one north of ranges sixty-five and sixty-six west; townships one hundred sixty-two north of ranges sixty-five and sixty-six west; townships one hundred sixty-three north of ranges sixty-five and sixty-six west; and townships one hundred sixty-four north of ranges sixty-five and sixty-six west lying within the county of Towner, and shall be entitled to one senator and two representatives;

11. The eleventh legislative district shall consist of the county of Pembina, and shall be entitled to one senator and two representatives;

12. The twelfth legislative district shall consist of the county of Pierce and townships one hundred fifty-one north of ranges sixty-nine, seventy, and seventy-one west; townships one hundred fifty-two north of ranges sixty-nine, seventy, and seventy-one west; townships one hundred fifty-three north of ranges sixty-seven, sixty-eight, sixty-nine, seventy, and seventy-one west; townships one hundred fifty-four north of ranges sixty-six, sixty-seven, sixty-eight, sixty-nine, seventy, and seventy-one west; townships one hundred fifty-five north of ranges sixty-seven, six-

ty-eight, sixty-nine, seventy, and seventy-one west; and townships one hundred fifty-six north of ranges sixty-seven, sixty-eight, sixty-nine, seventy, and seventy-one west lying within the county of Benson, and shall be entitled to one senator and two representatives;

13. The thirteenth legislative district shall consist of the counties of Eddy and Foster and townships one hundred fifty-one north of ranges sixty-two, sixty-three, sixty-four, sixty-five, sixty-six, sixty-seven, and sixty-eight west; townships one hundred fifty-two north of ranges sixty-two, sixty-three, sixty-four, sixty-five, sixty-six, sixty-seven, and sixty-eight west; and townships one hundred fifty-three north of ranges sixty-three, sixty-four, sixty-five, and sixty-six west lying within the county of Benson, and shall be entitled to one senator and two representatives;

14. The fourteenth legislative district shall consist of the counties of Sheridan and Wells, and shall be entitled to one senator and two representatives;

15. The fifteenth legislative district shall consist of the county of Ramsey, and shall be entitled to one senator and two representatives;

16. The sixteenth legislative district shall consist of townships one hundred fifty-five north of ranges fifty, fifty-one, fifty-two, and fifty-three west; townships one hundred fifty-six north of ranges fifty, fifty-one, fifty-two, and fifty-three west; townships one hundred fifty-seven north of ranges fifty, fifty-one, fifty-two, fifty-three, fifty-four, and fifty-five west; and townships one hundred fifty-eight north of ranges fifty, fifty-one, fifty-two, fifty-three, fifty-four, and fifty-five west lying within the county of Walsh, and

shall be entitled to one senator and two representatives;

17. The seventeenth legislative district shall consist of the county of Nelson and townships one hundred fifty-five north of ranges fifty-four, fifty-five, fifty-six, fifty-seven, fifty-eight, and fifty-nine west; townships one hundred fifty-six north of ranges fifty-four, fifty-five, fifty-six, fifty-seven, fifty-eight, and fifty-nine west; townships one hundred fifty-seven north of ranges fifty-six, fifty-seven, fifty-eight, and fifty-nine west; and townships one hundred fifty-eight north of ranges fifty-six, fifty-seven, fifty-eight and fifty-nine west lying with the county of Walsh, and shall be entitled to one senator and two representatives;

18. The eighteenth legislative district shall consist of township one hundred fifty-one north, range fifty west; and township one hundred fifty-two north, range fifty west lying within the county of Grand Forks, and shall be entitled to three senators and six representatives;

19. The nineteenth legislative district shall consist of the county of Grand Forks except township one hundred fifty-one north, range fifty west; and township one hundred fifty-two north, range fifty west lying within the county of Grand Forks, and shall be entitled to one senator and two representatives;

20. The twentieth legislative district shall consist of the county of Traill and townships one hundred forty-two north of ranges forty-nine, fifty, fifty-one, and fifty-two west; and townships one hundred forty-three north of ranges forty-nine, fifty, fifty-one, and fifty-two west lying within the county of Cass, and shall be entitled to one senator and two representatives;

21. The twenty-first legislative district shall consist of townships one hundred thirty-nine north of ranges forty-eight and forty-nine west; and townships one hundred forty north of ranges forty-eight and forty-nine west lying within the county of Cass, and shall be entitled to four senators and eight representatives;

22. The twenty-second legislative district shall consist of townships one hundred thirty-seven north of ranges forty-eight, forty-nine, fifty, fifty-one, fifty-two, fifty-three, fifty-four, and fifty-five west; townships one hundred thirty-eight, north of ranges forty-eight, forty-nine, fifty, fifty-one, fifty-two, fifty-three, fifty-four, and fifty-five west; townships one hundred thirty-nine north of ranges fifty, fifty-one, fifty-two, fifty-three, fifty-four, and fifty-five west; townships one hundred forty north of ranges fifty, fifty-one, fifty-two, fifty-three, fifty-four, and fifty-five west; townships one hundred forty-one north of ranges forty-nine, fifty, fifty-one, fifty-two, fifty-three, fifty-four, and fifty-five, west; townships one hundred forty-two north of ranges fifty-three, fifty-four, and fifty-five west; and townships one hundred forty-three north of ranges fifty-three, fifty-four, and fifty-five west lying within the county of Cass, and shall be entitled to one senator and two representatives;

23. The twenty-third legislative district shall consist of the counties of Griggs and Steele and townships one hundred forty north of ranges sixty and sixty-one west; townships one hundred forty-one north of ranges sixty and sixty-one west; townships one hundred forty-two north of ranges fifty-six, fifty-seven, fifty-eight, fifty-

nine, sixty, and sixty-one west; and townships one hundred forty-three north of ranges fifty-six, fifty-seven, fifty-eight, fifty-nine, sixty, and sixty-one west lying within the county of Barnes, and shall be entitled to one senator and two representatives;

24. The twenty-fourth legislative district shall consist of townships one hundred thirty-seven north of ranges fifty-six, fifty-seven, fifty-eight, fifty-nine, sixty, and sixty-one west; townships one hundred thirty-eight north of ranges fifty-six, fifty-seven, fifty-eight, fifty-nine, sixty, and sixty-one west; townships one hundred thirty-nine north of ranges fifty-six, fifty-seven, fifty-eight, fifty-nine, sixty, and sixty-one west; townships one hundred forty north of ranges fifty-six, fifty-seven, fifty-eight, and fifty-nine west; and townships one hundred forty-one north of ranges fifty-six, fifty-seven, fifty-eight, and fifty-nine west lying within the county of Barnes, and shall be entitled to one senator and two representatives;

25. The twenty-fifth legislative district shall consist of townships one hundred twenty-nine north of ranges forty-seven, forty-eight, and forty-nine west; townships one hundred thirty north of ranges forty-seven, forty-eight, and forty-nine west; townships one hundred thirty-one north of ranges forty-seven, forty-eight, forty-nine, and fifty west; townships one hundred thirty-two north of ranges forty-seven, forty-eight, forty-nine, and fifty west; townships one hundred thirty-three north of ranges forty-seven, forty-eight, forty-nine, and fifty west; townships one hundred thirty-four north of ranges forty-eight, forty-nine, and fifty west; townships one hundred thirty-five north of ranges forty-eight, forty-nine, and

fifty west; and townships one hundred thirty-six north of ranges forty-eight, forty-nine, and fifty west lying within the county of Richland, and shall be entitled to one senator and two representatives;

26. The twenty-sixth legislative district shall consist of the county of Sargent and townships one hundred twenty-nine north of ranges fifty, fifty-one, and fifty-two west; townships one hundred thirty north of ranges fifty, fifty-one, and fifty-two west; townships one hundred thirty-one north of ranges fifty-one and fifty-two west; townships one hundred thirty-two north of ranges fifty-one and fifty-two west; townships one hundred thirty-three north of ranges fifty-one and fifty-two west; townships one hundred thirty-four north of ranges fifty-one and fifty-two west; townships one hundred thirty-five north of ranges fifty-one and fifty-two west; and townships one hundred thirty-six north of ranges fifty-one and fifty-two west lying within the county of Richland, and shall be entitled to one senator and two representatives;

27. The twenty-seventh legislative district shall consist of the county of Ransom and townships one hundred thirty-three north of ranges fifty-nine, sixty, sixty-one, and sixty-two west; townships one hundred thirty-four north of ranges fifty-nine, sixty, sixty-one, and sixty-two west; townships one hundred thirty-five north of ranges fifty-nine, sixty, sixty-one, and sixty-two west; and townships one hundred thirty-six north of ranges fifty-nine, sixty, sixty-one, and sixty-two west lying within the county of La-Moure, and shall be entitled to one senator and two representatives;

28. The twenty-eighth legislative district shall consist of the county of Dickey and townships one hundred thirty-three north of ranges sixty-three, sixty-four, sixty-five, and sixty-six west; townships one hundred thirty-four north of ranges sixty-three, sixty-four, sixty-five, and sixty-six west; townships one hundred thirty-five north of ranges sixty-three, sixty-four, sixty-five, and sixty-six west; and townships one hundred thirty-six north of ranges sixty-three, sixty-four, sixty-five, and sixty-six west lying within the county of LaMoure, and shall be entitled to one senator and two representatives;

29. The twenty-ninth legislative district shall consist of the county of Stutsman, and shall be entitled to two senators and four representatives;

30. The thirtieth legislative district shall consist of the counties of Logan and McIntosh, and shall be entitled to one senator and two representatives;

31. The thirty-first legislative district shall consist of the counties of Kidder and Emmons, and shall be entitled to one senator and two representatives;

32. The thirty-second legislative district shall consist of the county of Burleigh, and shall be entitled to three senators and six representatives;

33. The thirty-third legislative district shall consist of the counties of Mercer and Oliver and townships one hundred thirty-nine north of ranges eighty-six, eighty-seven, eighty-eight, eighty-nine, and ninety west; and townships one hundred forty north of ranges eighty-six, eighty-seven, eighty-eight, eighty-nine, and ninety west lying within the county of Morton, and shall be entitled to one senator and two representatives;

34. The thirty-fourth legislative district shall consist of townships one hundred thirty-seven north of ranges seventy-nine, eighty, eighty-one, eighty-two, eighty-three, eighty-four, and eighty-five west; townships one hundred thirty-eight north of ranges eighty, eighty-one, eighty-two, eighty-three, eighty-four, and eighty-five west; townships one hundred thirty-nine north of ranges eighty, eighty-one, eighty-two, eighty-three, eighty-four, and eighty-five west; and townships one hundred forty north of ranges eighty-one, eighty-two, eighty-three, eighty-four, and eighty-five west lying within the county of Morton, and shall be entitled to one senator and two representatives;

35. The thirty-fifth legislative district shall consist of the counties of Grant and Sioux and township one hundred thirty-three north, range eighty-two west; townships one hundred thirty-four north of ranges seventy-nine, eighty, eighty-one, eighty-two, eighty-three, and eighty-four west; townships one hundred thirty-five north of ranges seventy-nine, eighty, eighty-one, eighty-two, eighty-three, and eighty-four west; townships one hundred thirty-six north of ranges seventy-nine, eighty, eighty-one, eighty-two, eighty-three, and eighty-four west; townships one hundred thirty-seven north of ranges eighty-six and eighty-seven west; and townships one hundred thirty-eight north of ranges eighty-six, eighty-seven, eighty-eight, eighty-nine, and ninety west lying within the county of Morton, and shall be entitled to one senator and two representatives;

36. The thirty-sixth legislative district shall consist of the counties of McKenzie and Dunn, and shall

be entitled to one senator and two representatives;

37. The thirty-seventh legislative district shall consist of townships one hundred thirty-seven north of ranges ninety-five, ninety-six, ninety-seven, ninety-eight, and ninety-nine west; townships one hundred thirty-eight north of ranges ninety-five, ninety-six, ninety-seven, ninety-eight, and ninety-nine west; townships one hundred thirty-nine north of ranges ninety-five, ninety-six, ninety-seven, ninety-eight, and ninety-nine west; and townships one hundred forty north of ranges ninety-five, ninety-six, ninety-seven, ninety-eight, and ninety-nine west lying within the county of Stark, and shall be entitled to one senator and two representatives;

38. The thirty-eighth legislative district shall consist of the county of Hettinger and townships one hundred thirty-seven north of ranges ninety-one, ninety-two, ninety-three, and ninety-four west; townships one hundred thirty-eight north of ranges ninety-one, ninety-two, ninety-three, and ninety-four west; townships one hundred thirty-nine north of ranges ninety-one, ninety-two, ninety-three, and ninety-four west; townships one hundred forty north of ranges ninety-one, ninety-two, ninety-three, and ninety-four west; and townships one hundred forty-one north of ranges ninety-one, ninety-two, and ninety-three west lying within the county of Stark and townships one hundred twenty-nine north of ranges ninety-one, ninety-two, ninety-three, and ninety-four west; townships one hundred thirty north of ranges ninety-one, ninety-two, ninety-three, and ninety-four west; townships one hundred thirty-one north of ranges ninety-one, ninety-two, ninety-three, ninety-four, ninety-five, ninety-six, ninety-seven, and ninety-eight west; and townships one hundred thirty-two north of ranges ninety-five, ninety-six, ninety-seven, and ninety-eight west lying within the county of Adams, and shall be entitled to one senator and two representatives; and

39. The thirty-ninth legislative district shall consist of the counties of Golden Valley, Billings, Slope, and Bowman and townships one hundred twenty-nine north of ranges ninety-five, ninety-six, ninety-seven, and ninety-eight west; and townships one hundred thirty north of ranges ninety-five, ninety-six, ninety-seven, and ninety-eight west lying within the county of Adams, and shall be entitled to one senator and two representatives.

SECTION 2. NUMBERING LEGISLATIVE DISTRICTS—CLASSES OF SENATORS TO PROVIDE STAGGERED TERMS.

The senators shall be divided into two classes, those elected in legislative districts designated by even numbers shall constitute one class, and those elected in legislative districts designated by odd numbers shall constitute the other class. The senators of one class elected in the first election held under the provisions of this Legislative Apportionment law shall hold their office for two years, those of the other class shall hold their office four years, and the determination of the two classes shall be by lot, so that one-half of the senators, as nearly as practicable, may be elected biennially. The president of the senate shall perform the lot in the presence of the majority and minority floor leaders of the senate within ten days after the commencement of the first session of the Legislative Assembly of this state which is comprised of senators elected hereunder, and shall certify in writing the results of such lot to the secretary of state within five days after its performance.