John D. PAULSON, Herschel Lashkowitz, Clarence D. Johnson, R. R. Smith, and Carl Albers, Plaintiffs,

v.

Ben MEIER, Secretary of State for the State of North Dakota, Defendant.

Civ. No. 618.

United States District Court
D. North Dakota,
Southwestern Division.

July 27, 1964.

Ronald N. Davies, J., dissented in part.

E. T. Conmy, Sr., of Conmy, Conmy & Feste, Fargo, N. D., for plaintiffs.

Paul M. Sand, First Asst. Atty. Gen., Bismarck, N. D., for defendant.

Before VOGEL, Circuit Judge, and REGISTER and DAVIES, District Judges.

REGISTER, District Judge.

The above-named Plaintiffs, as qualified voters in five of the senatorial districts of the State of North Dakota, commenced this action for the purpose of invalidating and setting aside the existing system of apportioning members of the state legislature, and for the further purpose of having declared unconstitutional those provisions of the North Dakota Constitution upon which said system is based. Specifically, Plaintiffs contend that Sections 26, 29 and 35 of Article II of said Constitution, as amended by the electorate of this state on June 28, 1960, and Section 54–03–01, NDCC, as amended, are unconstitutional in that they are, and each thereof is, in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. Plaintiffs assert that said constitutional provisions and statute abridge and decimate their rights and privileges as citizens and voters, deprive them of liberty without due process of law, and deny them equal protection of the law.

Sections 26, 29 and 35 of the Constitution of North Dakota, as amended, read as follows:

"Section 26. The senate shall be composed of forty-nine members.

"Section 29. Each existing senatorial district as provided by law at the effective date of this amendment shall permanently constitute a senatorial district. Each senatorial district shall be represented by one senator and no more.

"Section 35. Each senatorial district shall be represented in the House of Representatives by at least one representative except that any senatorial district comprised of more than one county shall be represented in the House of Representatives by at least as many representatives as there are counties in such senatorial district. In addition the Legislative Assembly shall, at the first regular session after each federal decennial census, proceed to apportion the balance of the members of the House of Representatives to be elected from the several senatorial districts, within the limits prescribed by this Constitution, according to the population of the several senatorial districts. If any Legislative Assembly whose duty it is to make an apportionment shall fail to make the same as herein provided it shall be the duty of the chief justice of the supreme court, attorney general, secretary of state, and the majority and minority leaders of the House of Representatives within ninety days after the adjournment of the legislature to make such apportionment and when so made a proclamation shall be issued by the chief justice announcing such apportionment which shall have the same force and effect as though made by the Legislative Assembly."

It is a further contention of the Plaintiffs that the constitutional amendments referred to were submitted to the voters of North Dakota on a ballot which gave to said voters no opportunity to vote for or against one or more of the sections separately, but that the same constituted one measure and as such each is a part of an invalid system of apportionment.

■ The fact that the existing apportionment law (Section 54–03–01, as amended) is based upon provisions of a constitutional amendment approved by the electorate of this state is of no significance in the determination of the issues before us. In Lucas et al. v. The Forty-Fourth General Assembly of the State of Colorado et al., 84 S.Ct. 1459 at page 1474 the Supreme Court states:

"We hold that the fact that a challenged legislative apportionment plan was approved by the electorate is

without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause, as delineated in our opinion in Reynolds v. Sims."

That the issues here raised constitute a justiciable controversy, subject to adjudication by this Court, is well established. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

The complaint herein was filed on February 24, 1964. Our designation as a three-judge District Court to hear and determine this action, pursuant to Sections 2281 and 2284, Title 28 U.S.C.A., was filed March 25, 1964. The matter was submitted by the parties, upon briefs, pursuant to stipulation and order, and the final brief (Plaintiffs' Reply Brief) was filed on June 2, 1964. At that time there were then pending before the Supreme Court of the United States several cases involving the questions here involved, the decisions in which this Court believed would likely either determine the present controversy or at least establish guide lines for its determination. Decided by the Supreme Court, in opinions published on June 15, 1964, are the following: Reynolds, etc. et al. v. Sims et al., 84 S.Ct. 1362; WMCA Inc. et al v. Lomenzo, 84 S.Ct. 1418; Lucas et al. v. The Forty-Fourth General Assembly, etc. et al., 84 S.Ct. 1459; The Maryland Committee for Fair Representation et al. v. Tawes, 84 S.Ct. 1429; Davis, Secretary, et al. v. Mann, et al., 84 S.Ct. 1441; and Roman Clark, etc. et al. v. Sincock et al., 84 S.Ct. 1449.

In Reynolds, supra, 84 S.Ct. at page 1385, the Supreme Court states:

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."

The following quotations from the same opinion succinctly reveal the thinking of the Court in arriving at its conclusions:

"Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." (page 1382)

"But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. * * * Full and effective participation by all citizens in state government requires, therefore, that each citizen has an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less." (page 1383)

"With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. * * * Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race." (page 1384).

The Supreme Court recognizes the practical difficulty of formulating a proper and equitable remedy. It states that " * * * mathematical nicety is not a constitutional requisite * * * " (Reynolds, supra, page 1385) and

> "By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." (Reynolds, supra, page 1390)

Recognizing that some flexibility may be constitutionally permissible, the Supreme Court clearly stated, however, that, to be valid, the apportionment must be " * * one based substantially on population and the equal-population principle * * * not diluted in any significant way." Reynolds, supra, p. 1390.

■ In light of the very recent decisions of the Supreme Court of the United States above cited, and the guide lines therein established, we hold that the existing legislative apportionment system of this state is constitutionally not permissible, and that Sections 26, 29 and 35 of Article II of the Constitution of the State of North Dakota, as amended, and Section 54–03–01, NDCC, as amended, are unconstitutional as being violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

The invalidity of the present apportionment system is readily demonstrable. Sections 26 and 29 of the state constitution, as amended, permanently fix the number of senatorial districts at forty-nine, and Section 29 further provides that "Each existing senatorial district as provided by law at the effective date of this amendment shall permanently constitute a senatorial district. Each senatorial district shall be represented by one senator and no more." It is therefore apparent that the constitutional amendments not only fail to consider population as the prime factor, but in effect provide and require that the senate be apportioned strictly on an area basis, without regard to population.

Section 54–03–01, NDCC, provides that "The senatorial districts of the state shall be formed, and the senators and representatives shall be apportioned as follows:". Thereinafter forty-nine legislative districts were established, and one senator apportioned to each. The practical effect of this method of apportionment is significant. According to the federal census of 1960 (of which we take judicial notice), District 43, consisting of Renville County, contained a population of 4,698, whereas District 29, composed of the city of Minot and a designated rural portion of Ward County, had a population of 42,041, and District 9, composed of the Township of Fargo and the city of Fargo, in Cass County, contained a population of 38,494. As can be seen from these examples, very substantial differences in the population of at least some of the legislative districts prevail. Such a method of apportioning senators "is not sustainable under the requirements of the Equal Protection Clause".

That the existing system of apportioning members of the state House of Representatives is based primarily on area rather than population is also apparent. The formula provided by Section 35, as amended, for the apportionment of representatives is that each senatorial district shall be represented by at least one representative, that each district comprised of more than one county shall be represented by at least as many representatives as there are counties in the district, and that the balance of the members be apportioned according to population.

Section 54–03–01, NDCC, as amended, provides that District 39, composed of the Counties of Billings, Bowman, Slope and Golden Valley (and containing a population of 10,660) be apportioned four representatives; District 25, consisting of Dickey County (and having a population of 8,147) be apportioned one representative; District 14, consisting of Ransom County (and having a population of 8,078) be apportioned one representative; and each of Districts 3, consisting of a designated portion of Walsh County (and containing a population of 8,423) and 26, consisting of Emmons County (and having a population of 8,462) be apportioned two representatives. Such a system clearly violates the "basic constitutional standard" referred to by the Supreme Court. The existing apportionment scheme, taken as a whole, " * * * result(s) in a significant undervaluation of the weight of the votes of certain of (the) State's citizens merely because of where they happen to reside". WMCA, Inc., et al., supra, 84 S.Ct. page 1428.

■ As we hold Section 54–03–01, NDCC, as amended, unconstitutional, it follows that the last valid apportionment, if any, continues " * * * to be the law governing * * * until it is superseded by a valid apportionment * * * ". State ex rel. Lein et al. v. Sathre, et al., N.D., 113 N.W.2d 679, at pages 687–688. The last previous apportionment law is Chapter 7, Session Laws N.D. 1931 (Section 54–03–01, NDCC, prior to its amendment). All members of the 1963 Legislative Assembly were elected pursuant to this law.

We have given careful consideration to the 1931 apportionment law. With one minor exception the respective legislative districts, being forty-nine in number, consist of the same area or areas as provided in the amendment. One senator was apportioned to each district; the apportionment of representatives to the various districts was changed rather substantially by the amendment.

■ We therefore hold that the 1931 apportionment statute is vulnerable to the same constitutional attack as its amendment, and we hereby find and declare it to be constitutionally invalid. We further find and declare that any and all existing laws of this state relating to legislative apportionment which limit or prescribe district areas or boundaries, or apportion the members of the legislative assembly on any basis other than population, are unconstitutional and void. It is our conclusion, and we so hold, that there is no constitutionally valid legislative apportionment law in existence in the State of North Dakota at this time.

The difficulty we encounter in determining the appropriate remedy to be granted should not be underestimated. Plaintiffs urge affirmative action by this Court, asking us, in effect, to redistrict the state as to senatorial or legislative districts, apportion the number of senators and representatives as to each such district, and prescribe the method for their election.

■ A provisional plan which has been carefully and exhaustively considered by us is that we redistrict the state, apportion the number of senators and representatives to each thereof (based upon a population formula), and order the Defendant to cause to be held a special primary election for the nomination of candidates to the seats of both the senate and house of representatives in the next Legislative Assembly—all this to be done in time to permit the electorate to ballot upon the nominees in the scheduled general election of 1964. Two effects of the adoption of such method would be that of nullifying the results of the recent primary election (held on June 30) insofar as it affects those candidates for the legislative assembly, and that of causing the very substantial expense to the state for the special primary election called for this purpose.

In the course of considering this plan, we necessarily examined the election laws of this state, and in particular those which establish specific periods of time within which certain acts must be performed. We refer to only a few.

The petitions to be filed by each of the candidates must be filed with the appropriate county auditor at least forty days prior to the primary election. Section 16-04-04, NDCC. Of course, prior to such filing, the petitions would have to be printed and circulated by the candidates, and signatures of the required number of qualified voters secured thereon. County canvassing boards are required to meet and canvass the returns within one week after the election returns are received by the county auditors. Section 16-13-15, NDCC. The county auditors are thereupon required to transmit to the secretary of state certified abstracts of votes (including those cast for members of the Legislative Assembly) within fifteen days after the day of a primary election. Section 16-13-20, NDCC. The returns made by the county auditors are then canvassed by the state board of canvassers at a meeting called by the secretary of state "not later than twenty days next following a primary, general or special election". Section 16-13-36, NDCC. Thereafter, some reasonable time would be required for the printing of sample ballots and notice of the general election. Such notice of election must be published once each week for two consecutive weeks next preceding the general election, and a copy of the sample ballot must be published for two consecutive weeks prior to the election. Section 16-06-02, NDCC.

The 1964 general election is fixed by statute (Section 16-06-01, NDCC) to be held on November 3. In our opinion reasonable and adequate time is not now available—and has not been available since the Supreme Court decisions of June 15—within which we could formulate a redistricting and reapportioning plan which would permit the nomination of candidates at a special primary election and the election of state legislators at the November 3 general election, all in compliance with the statutory requirements referred to.

The impediments inherent in such a plan, existing by virtue of the statutory provisions alluded to, might possibly be obviated by our ordering that the members to be elected to the 1965 Legislative Assembly be elected at large. It is obvious, however, that such a method is, or might be, more unfair and inequitable than that provided for by the one which was in existence prior thereto. It is possible, in an at-large election, that a relatively small group of voters (numerically or percentage-wise) might very well, if organized, effect a voting weight out of all proportion to its number, and result in a wrong far more grievous than that which has in the past been suffered by some of the voters of this state. It is our opinion that an at-large election should not, and will not, be ordered.

Plaintiffs have submitted two proposed redistricting and reapportioning plans. We refer to them as Plan 1 and Plan 2. Plan 1 calls for forty-nine senatorial districts, each thereof being apportioned one senator, and a total of 107 representatives. Plan 2 provides for forty-one senatorial districts, each thereof being apportioned one senator, and a total of 109 representatives. In neither of these proposed plans have district lines been drawn for the more populous areas of the state, including the counties of Cass, Grand Forks, Burleigh, Norton, Ward and Williams. In Plan 1, District 5, with a population of 15,109, would be apportioned three representatives; each of Districts 14, having a population of 14,849, 15, having a population of 14,934, 48, having a population of 9,451, and 49, having a population of 9,373, would be apportioned two representatives. Substantial disparities exist as to other districts. With regard to Plan 2, each of Districts 18, 28 and 29, each having a population of 15,302, and 23, having a population of 15,164, is apportioned three representatives, whereas each of Districts 9, having a population of 14,030, 20, with a population of 14,934, 25, with a population of 14,371, and 26, having a population of 14,598, is apportioned two

representatives. Again, similar disparities exist as to other districts.

These comments are made solely to indicate the detailed information and careful study and planning necessarily involved in formulating a constitutionally permissive legislative apportionment law, and the complexities of the subject matter involved. We believe that even a temporary, provisional plan, if adopted by us, should and must comply with the basic constitutional standard as set out by the Supreme Court in its June 15 decisions.

■ We also have in mind the judicially well established recognition that legislative apportionment is primarily for the consideration and determination of the legislative body of each state.

In Reynolds, supra, 84 S.Ct. at page 1393, the Supreme Court said:

"It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking apropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, in concurring in Baker v. Carr, 'any relief accorded can be fashioned in the light of well-known principles of equity.' * * *

" * * * And it (The United States District Court for the District of Alabama) correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."

Prior to the June 15 decisions of the Supreme Court, there was no judicial mandate requiring the apportioning of both houses of a bicameral state legislature to be based substantially on population. Subsequent to said decisions, we cannot say that the legislative assembly of this state has had, or will have, prior to the November 3 general election, a timely or adequate opportunity to "reapportion according to federal constitutional requisites".

We note that for several months prior to June 15 the Legislative Research Committee of this State had publicly announced it was considering legislative apportionment legislation which would affect both houses of the North Dakota Legislative Assembly and which would comply with constitutional requirements.

In The Maryland Committee, supra, the Supreme Court held that the Maryland constitutional provisions relating to legislative apportionment were unconstitutional. That Court, after stating:

"Since all members of both houses of the Maryland General Assembly were elected in 1962, and since all Maryland legislators are elected to serve four-year terms, the next election of legislators in Maryland will not be conducted until 1966. Thus, sufficient time exists for the Mary-

land Legislature to enact legislation reapportioning seats in the General Assembly prior to the 1966 primary and general elections. * * *" (84 S.Ct. page 1452)

continued as follows:

"Since primary responsibility for legislative apportionment rests with the legislature itself and since adequate time exists in which the Maryland General Assembly can act, the Maryland courts need feel obliged to take further affirmative action only if the legislature fails to enact a constitutionally valid state legislative apportionment scheme in a timely fashion after being afforded a further opportunity by the courts to do so." (p. 1452)

In WMCA, Inc., supra, a case involving the apportionment of seats in both houses of the New York Legislature, the Supreme Court, after concluding (84 S.Ct. page 1429) " * * * that neither the existing scheme nor the forthcoming one can be constitutionally condoned", expressed itself, as regards remedies, in the following language: (84 S.Ct. page 1429)

"We find it inappropriate to discuss questions relating to remedies at the present time, beyond what we said in our opinion in Reynolds. Since all members of both houses of the New York Legislature will be elected in November 1964, the court below, acting under equitable principles, must now determine whether, because of the imminence of that election and in order to give the New York Legislature an opportunity to fashion a constitutionally valid legislative apportionment plan, it would be desirable to permit the 1964 election of legislators to be conducted pursuant to the existing provisions, or whether under the circumstances the effectuation of appellants' right to a properly weighted voice in the election of state legislators should not be delayed beyond the 1964 election."

Our attention has been invited to the fact that a three-judge federal court in Colorado has recently ordered a redistricting and reapportionment of all state legislative seats, effective immediately, in conformity with the pronouncements of the Supreme Court. However, it is to be noted that the primary election in Colorado will not be held until some time in September, and the factual situation there existing is dissimilar to that in North Dakota. At the time of the announcement of the Supreme Court decisions (June 15), the election machinery of this state was in progress; the June 30 primary election was imminent. Party nominating conventions had been held weeks prior thereto; the last day permitted by law for the filing of petitions by candidates was more than three weeks prior to June 15; and ballots had been printed, and had been available for use by those electors permitted by the laws of this state to vote as "absent voters".

We hold that the Thirty-ninth Legislative Assembly (1965) of North Dakota, consisting of members elected under existing law, will have a de facto status; that at such regular session it should promptly devise and pass legislation creating and establishing a system of legislative districting and apportionment consistent with federal constitutional standards; that the effective date of this Order and Decree will be stayed until after the 1964 general elections have been held and for a reasonable time after the commencement of the 1965 Legislative Assembly in order to afford such Assembly a reasonable and adequate opportunity to enact such apportionment legislation. See: League of Nebraska Municipalities et al., v. Marsh, July 1964, 232 F.Supp. 411, and Meeks et al. v. Anderson, et al., 229 F.Supp. 271 (D. C.Kan.1964).

The injunctive relief prayed for is denied.

We retain and reserve jurisdiction herein for such further relief and orders, if any, as may hereafter be deemed proper.

RONALD N. DAVIES, District Judge (dissenting).

I am in total agreement with the majority of this Court in holding that Sections 26, 29 and 35 of Article II of the Constitution of the State of North Dakota, as amended by the electorate June 28, 1960, and Section 54–03–01, North Dakota Century Code, as amended, are unconstitutional and violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

I am in total disagreement with the majority in their action permitting a *de facto* [1] Legislative Assembly to meet, legislate and attempt to enact a reapportionment law in 1965.

In Lein v. Sathre, D.C. 205 F.Supp. 536, (1962), a case in which the Plaintiffs attacked the apportionment in the North Dakota House of Representatives and which was heard by this same Court, in dissenting from the majority opinion I said:

"The Plaintiffs have twice sought affirmative relief in this Court. In my view they are entitled to it here and now. I decline to speculate whether the 1963 Legislative Assembly will fulfill its mandatory obligation to reapportion in such manner as will approach as nearly as is possible a mathematical equality. I would wait no longer upon the vagaries of the future."

The fact is, and all members of this Court now agree, that the action taken by the 1963 Legislature is invalid and a nullity. Once more, in the case now before us, I decline to speculate on what the 1965 Legislative Assembly will do with respect to legal reapportionment of the Senate and House. I know only that in 1963 the Assembly failed to enact a valid reapportionment law as it affects the House of Representatives.

The Equal Protection Clause of the Constitution of the United States cannot and does not protect the constitutional rights of these Plaintiffs in the General Election of 1964 and in the deliberation of the 1965 Legislative Assembly under the holding of the majority of this Court in this case.

It is true, as the majority opinion points out, that the United States Supreme Court has found it inappropriate to discuss questions relating to remedies beyond which that Court expressed itself in Reynolds v. Sims, 84 S.Ct. 1362, 1393, but the Court did say in Reynolds that *"It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. * * *"* (Emphasis supplied).

The case before us is neither so unusual nor so novel as to justify permitting the 1964 elections under the concededly unconstitutional apportionment laws of North Dakota. We are not wholly inexperienced in reapportionment litigation.

The Supreme Court of the United States has carefully charted the course for us in this type of case, leaving it to us to implement their teachings in the light of equitable considerations. That the disruption of the regular election machinery would be a hardship and entail additional expense, I am well aware. But what of the rights of those before us who seek relief?

I believe that the equities here are clearly with these Plaintiffs. For nearly a quarter of a century their voting rights and those similarly situated have been

---

1. *de facto.* In fact, indeed, actually. This phrase is used to characterize an officer, a government, a past action, or a state of affairs which must be accepted for all practical purposes, but is illegal or illegitimate. In this sense it is the contrary of *de jure* which means rightful, legitimate, just, or constitutional. Black's Law Dictionary, Fourth Edition.

diluted and decimated. Permitting elections to the North Dakota Senate and House in the General Election of 1964, as now scheduled, means two more years of obvious unequal representation, two more years of taxation with partial representation, and two more years of a delayed remedy which I cannot in good conscience justify.

I am also well aware of the political thicket into which we are plunged, but we must, I think, be ever mindful of our obligations in a justiciable controversy involving the constitutional rights of citizens of a sovereign state and nation.

The Plaintiffs here are entitled to the injunctive relief which they seek and this Court should, in my opinion, proceed promptly to enter its own order temporarily reapportioning the Senate and House, causing elections to be held thereunder and retaining jurisdiction in order that, if the new Legislative Assembly did not permanently reapportion in accordance with the decisional law as enunciated by the Supreme Court of the United States, the Plaintiffs here would be in position promptly to seek appropriate relief from this Court.

I dissent.